**IN THE COURT OF APPEALS OF IOWA**

No. 23-2036
Filed March 5, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**AIDAN CHRISTOPHER RALPH,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Story County, Bethany Currie (trial)

and John J. Haney (sentencing), Judges.

        A defendant appeals his conviction for third-degree sexual abuse.

**AFFIRMED.**

        Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for

appellant.

        Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.

        Heard by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**TABOR, Chief Judge.**

A jury convicted Aidan Ralph of third-degree sexual abuse and assault causing bodily injury for pushing his girlfriend, A.C., into a staircase—fracturing a vertebra in her spine—then sexually assaulting her in his bedroom. In appealing his sexual-abuse conviction, Ralph raises two evidentiary issues. First, he claims the district court abused its discretion by allowing a police officer to testify that other witnesses' statements aligned with A.C.'s accusations. Second, he claims the court abused its discretion in admitting evidence that he physically abused A.C. on prior occasions to establish his motive for sexually abusing her. He requests that we reverse his sexual-abuse conviction and remand for a new trial. Finding the court properly exercised its discretion in admitting the challenged evidence, we affirm.

## I.    Facts and Prior Proceedings

Ralph and A.C. started dating in high school. After graduation, they both attended Iowa State University, where they continued their romantic relationship. On a December evening in 2022, they made plans to celebrate Ralph's birthday. They started by drinking at a "pregame" party. Afterward, A.C. returned to her dorm with her roommates, and Ralph went out to a bar. A.C. planned to "meet up with him there." But instead, Ralph came to A.C.'s dorm, upset that he had lost his ID cards. A.C. recalled that Ralph "started getting loud." A.C. told Ralph to leave. So he went back to his apartment. Meanwhile, A.C. and her roommates went out to a bar without him.

But soon Ralph sent A.C. a barrage of text messages begging her to leave her friends and come to his place. Acceding to his wishes, A.C. left the bar and

took an Uber to Ralph's apartment. When she arrived, she went upstairs to Ralph's bedroom.[1] Ralph was lying in his bed crying. He told A.C. that she embarrassed him by going out without him. A.C. recalled that when she didn't respond, "he started getting really aggressive"—rising from his bed and yelling at her to leave. Frightened, A.C. left the bedroom, grabbed her shoes, and ran downstairs to the entryway. Ralph caught up to her there. He was "still continuously telling [her] to leave" and started "shoving [her] around." To stop her from leaving, Ralph took A.C.'s shoes and "threw them across the street." Then, as A.C. described it: "he had pushed me really hard against the stairs where I hit my head really, really hard and my back." The impact fractured a vertebra in her spine.

A.C. "didn't try leaving after that" because she was in "a lot of pain." She asked Ralph to help her, but he "didn't care at all." According to A.C., after he pushed her into the stairs, Ralph "just continued yelling" at her and told her she "deserved it." A.C. then climbed the stairs to Ralph's bedroom, "crying the whole time." Ralph followed her, telling her to "be quiet" because "his roommate was there." Once they were inside Ralph's bedroom, A.C. took off the tight pants she'd been wearing because they were "really painful" and got into Ralph's bed. She testified that she "wanted to make it seem like [she] was going to stay" so Ralph wouldn't be angry. Ralph continued yelling at her. A.C. asked him to call an ambulance for her. He refused.

---

[1] Ralph lived in a three-story apartment. The ground level was the entryway, the second floor was the living room and kitchen area, and the third floor was a hallway and two bedrooms.

According to A.C., Ralph "got quiet" after a while. Then, without saying anything, he climbed onto the bed and "trie[d] having sex with [her]." A.C. told him "no." But Ralph didn't stop. He pulled her underwear to the side and started having vaginal intercourse with her. While Ralph was doing this, A.C. "said 'no' a few times." And she was "crying the whole time." She didn't physically resist him because she "didn't want to get more hurt." Eventually, Ralph "flipped [her] over," then became "frustrated." Then he stopped having intercourse with her and asked her to "give him a blow job." A.C. again said "no." After that, Ralph "went right back into just yelling" at her. Sometime later, A.C. fell asleep. A.C. testified that she didn't want to have sex with Ralph that night "at all."

The next morning, Ralph called one of A.C.'s roommates to get her. He told the roommate that A.C. "had a bad accident where [she] fell down the stairs getting a glass of water" and that "she was really hurt." A.C. told Ralph that she "was going to go along" with that story because she "didn't want to make him angry anymore." Two of A.C.'s roommates picked her up. One of them recalled that when Ralph "brought [A.C.] out" of the apartment, "she was walking but very poorly"; "she looked, like, miserable, disheveled, and [when] she got in the back seat of my car, . . . she didn't say a single word to us." Ralph rode with A.C. and her roommates back to their dorm. When they arrived, Ralph went with A.C. "straight to her room." About two weeks later, A.C. and Ralph broke up.

When she returned home to Illinois for winter break, A.C. told her mother that Ralph physically and sexually assaulted her. A.C.'s uncle reported the incident to the Ames Police Department. Officer Adam McPherson investigated. McPherson interviewed A.C. over the phone. He also interviewed A.C.'s

roommates; Ralph's roommate and his girlfriend, who were in the apartment on the night of the incident; and Ralph. At first, Ralph told Officer McPherson that A.C. "just showed up" at his apartment "uninvited," and "he told her to leave." He first denied that he pushed A.C. or "that there was any sexual activity." When McPherson continued pressing him about what happened, Ralph admitted pushing A.C. He also "admitted that they engaged in consensual sexual intercourse."

The State charged Ralph with sexual abuse in the third degree, a class "C" felony, in violation of Iowa Code sections 709.1 and 709.4(1) (2022), and domestic abuse assault causing bodily injury, a serious misdemeanor, in violation of sections 708.1, 708.2A(1), and 708.2A(2)(b). The case went to jury trial five months later.

The State filed a pretrial motion to introduce evidence that Ralph physically assaulted A.C. on prior occasions. The district court reserved ruling on the admissibility of those incidents until trial. The court cautioned: "[T]he State should presume that none of its prior bad acts evidence will be admitted unless and until the State can demonstrate during trial that it relates to a legitimate, disputed issue other than character or propensity." The court further instructed in its pretrial ruling: "If Mr. Ralph does not dispute a particular issue for which the State seeks to proffer bad acts evidence, the evidence will never come in." The State renewed its motion to introduce the evidence on the first day of trial. The court again denied the motion, stating: "I think my ruling was pretty clear on the prior bad acts evidence. It's not coming in."

A.C. was the State's key witness.[2]   A.C.'s two roommates; Ralph's roommate and his girlfriend; a physician who treated A.C.'s back injury; and Officer McPherson also testified for the State.[3]  The State also presented expert testimony on cycles of violence in abusive intimate relationships and how victims of domestic and sexual abuse respond to trauma.

Ralph testified in his own defense.  He admitted that he pushed A.C. one time in the entryway of his apartment, and as he pushed her, "she fell straight . . . into the stairs."  He testified that in that moment, he "couldn't believe that [he] did that."  Afterward, Ralph could see that A.C. was in pain, but she managed to climb up the stairs on her own.  According to Ralph, when they got back upstairs, he told A.C. "to shut the fuck up, but it wasn't . . . in a mean way."  He acknowledged that A.C. asked him to call an ambulance but he refused because he "didn't believe it was that serious."  He also recalled that A.C. was crying, "but she eventually, like, stopped."  Ralph claimed that they both calmed down and talked for "two or three hours" after that.  Then they went to bed.

According to Ralph, he and A.C. both got into his bed completely naked and engaged in consensual sex.  Ralph testified that at some point, he stopped because A.C. "was in pain," and he "suggested that she would flip around."  After attempting to initiate sex again, Ralph stopped because A.C. was still in pain and "it wasn't joyful."  Ralph said that he then "asked for oral sex," but A.C. refused, so

[2] The State again renewed its motion to introduce the evidence of the prior assaults during A.C.'s testimony.  The court again denied the motion, stating: "the ruling stands that at this point in the trial there are no legitimate disputed issues for which relevant bad acts evidence may be offered."
[3] The State presented Officer McPherson's body camera video of his interview with Ralph during the officer's testimony.

he didn't "press it any f[u]rther." According to Ralph, he didn't get angry or yell at A.C. after that—they "just went to bed." Ralph admitted that he lied to Officer McPherson about what happened that night because he was "very scared" and "very emotional." And he said that he first denied having sex with A.C. because the officer's questions made him "very uncomfortable."

During cross-examination, the State once more sought to introduce evidence that Ralph had physically assaulted A.C. on earlier occasions. Changing course from its previous rulings, the court granted the motion, finding that "Mr. Ralph opened the door for prior bad acts evidence, specifically by saying, 'I couldn't believe I did that' and 'we talked about fighting all the time.'" The court further found that "the evidence is relevant to Mr. Ralph's motive to commit sex abuse specifically against [A.C.] due to the nature of their relationship." The State then questioned Ralph about prior incidents when he was "physically assaultive" towards A.C. and caused bruising to her eyes and arms.

After the defense rested, the court granted Ralph's motion for judgment of acquittal as to the relationship element of the domestic abuse count and amended that charge to assault causing bodily injury in violation of Iowa Code sections 708.1 and 708.2(2). In his closing argument, Ralph's counsel asked the jury to find him guilty of assault causing bodily injury but not guilty of sexual abuse. The jury found Ralph guilty of both counts. The court sentenced him to concurrent prison terms not to exceed ten years, followed by a mandatory lifetime special sentence of supervision under section 903B.1. Ralph appeals.

## II. Scope and Standard of Review

We review most evidentiary rulings for abuse of discretion. *State v. Slaughter*, 3 N.W.3d 540, 546 (Iowa 2024). "An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Tipton*, 897 N.W.2d 653, 690 (Iowa 2017) (citation omitted). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000).

## III. Analysis

### A. Vouching

Ralph first argues that the district court abused its discretion by overruling his objection to testimony from Officer McPherson that improperly vouched for A.C.'s credibility. Vouching occurs when an expert witness testifies directly or indirectly that a victim's statements are credible, "thereby commenting on a defendant's guilt or innocence." *State v. Jaquez*, 856 N.W.2d 663, 665 (Iowa 2014). Such testimony is inadmissible because "a witness's credibility is not a fact in issue subject to expert opinion." *State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014) (cleaned up); *see* Iowa R. Evid. 5.702. But an expert's testimony that the victim's statements were consistent over time or consistent with statements from other witnesses is admissible, and "[t]he jury is entitled to use this information to determine the victim's credibility." *Dudley*, 856 N.W.2d at 678 (finding expert did not vouch by testifying that victim's "statements were consistent throughout the interview"); *see State v. Brown*, 856 N.W.2d 685, 688–89 (Iowa 2014) (finding

expert did not vouch by testifying that victim "has been consistent in what she has reported to her mother and to this examiner").

The prosecutor asked Officer McPherson about the interviews he conducted with roommates of A.C. and Ralph. This exchange ensued:

> STATE: And after interviewing them, was at least the information that they were able to provide consistent with what [A.C.] had reported to you?
> DEFENSE: Objection. Improper vouching.
> THE COURT: Response?
> STATE: Under *Dudley*, this is exactly what is permitted. He can indicate it's consistent. He's not vouching for any witness. He's indicating that, amongst them all, . . . it was consistent.
> THE COURT: The objection is overruled and you can answer the question.
> OFFICER MCPHERSON: That's—the people that I spoke with, the stories provided were consistent with one another.

Ralph argues that this testimony impermissibly vouched for A.C.'s credibility because "[t]he clear implication from [the officer's] answer was that [A.C.] told the truth because her roommates' stories were consistent with hers." We have rejected a similar challenge and explained why this type of testimony does not cross the line into vouching:

> An expert can report a single witness's story did not change, i.e. remained consistent, just as the expert can report that the story of two separate witnesses matched. This factual testimony as to whether the two stories were the same does not comment on whether the witnesses were telling a true or false version of the alleged events; it just relays that they both reported the same thing.

*Beek v. State*, No. 20-0704, 2021 WL 5106445, at *4 (Iowa Ct. App. Nov. 3, 2021). Ralph's challenge fails for the same reason.

As the State contends, Officer McPherson did not vouch for the credibility of a particular witness. He just reported a relevant fact: all the witnesses he interviewed—except for Ralph—gave accounts of the "night in question" that

generally matched. The jurors still had to decide for themselves whether they believed A.C. The district court thus did not abuse its discretion in admitting Officer McPherson's testimony over Ralph's objection.

### B. Prior Bad Acts

Second, Ralph argues that the district court abused its discretion by admitting evidence that he physically abused A.C. on prior occasions to establish his motive for sexually abusing her. Iowa Rule of Evidence 5.404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Iowa R. Evid. 5.404(b)(1). Even so, "[t]his evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2).

Rule 5.404(b) is a rule of exclusion. *State v. Thoren*, 970 N.W.2d 611, 625 (Iowa 2022). For the State to introduce evidence of prior bad acts:

> (1) "the evidence must be relevant and material to a legitimate issue in the case other than a general propensity to commit wrongful acts"; (2) "there must be clear proof the individual against whom the evidence is offered committed the bad act or crime"; and (3) if the first two prongs are satisfied, "the court must then decide if [the evidence's] probative value is substantially outweighed by the danger of unfair prejudice to the defendant."

*State v. Richards*, 879 N.W.2d 140, 145 (Iowa 2016) (alteration in original) (quoting *State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004)).

Our supreme court considered the admissibility of prior acts of domestic violence in *State v. Taylor*, 689 N.W.2d 116 (Iowa 2004). In that case, the court noted that domestic violence is unique because it "is a pattern of behavior, with

each episode connected to the others." 689 N.W.2d at 128 n.6 (citation omitted). "Thus, evidence of prior bad acts is especially relevant and probative in domestic violence cases because of the cyclical nature of domestic violence." *Id.* (cleaned up). The court held that evidence of prior abusive conduct by the defendant against the same victim as the alleged crime may be relevant to the defendant's motive and intent. *Id.* at 125 ("[T]he defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations.").

Similarly, in *State v. Rodriguez*, the court concluded that evidence of prior abuse by the defendant against the victim was admissible when the defendant was charged with murder, kidnapping, and assault against his girlfriend (the victim of the prior abuse) because "prior intentional, violent acts towards the victim . . . [made] it more probable that [the defendant] intended to cause [the victim] serious injury" on the day of the charged crimes. 636 N.W.2d 234, 242 (Iowa 2001).

In that vein, evidence of prior violence perpetrated by the defendant against a romantic partner may be relevant and admissible to give context to that relationship and to show whether sex between them on a specific occasion was consensual.[4] *State v. Goodson,* 958 N.W.2d 791, 801 (Iowa 2021) (the defendant

---

[4] We recognize that the district court found that Ralph and A.C. did not have a domestic relationship as defined in Iowa Code section 236.2(2)(a) through (d). But Ralph did not dispute that they were intimate partners. And, as the State's expert testified, intimate partners may experience the same kind of power-and-control dynamics as individuals who are cohabitating.

"claimed . . . that [he and the victim] engaged in consensual sex. [The victim] told a much different story. Surely the evidence showing the contentious nature of the relationship between [the victim] and [the defendant] was relevant on the question of whose story to believe.").

With this framework in mind, we turn to Ralph's case. During cross-examination, the State moved to admit evidence that Ralph physically abused and injured A.C. on prior occasions, arguing:

> [T]he State's position on legitimate issues is that this goes to motive and knowledge in this case. [Ralph] is motivated by his anger and motivated to have control of [A.C.], both physically and sexually, and knowledge in that he's aware that she doesn't want to do it. . . . He testifies to her being in pain, and he knew in that moment that he didn't have consent, and I think we're talking about the nature of their relationship.

The prosecutor maintained that the jurors could not understand Ralph's motive or his awareness that there was no consent—the contested issue in the case—if they only received his "one-sided version" of the events. And the prosecutor contended that the jury was entitled to have "a full picture" of the relationship, "just like in *Taylor* and in *Rodriguez*."

Relying on *Goodson*, the district court ruled that "the evidence is relevant to Mr. Ralph's motive to commit sex abuse specifically against [A.C.] due to the nature of their relationship," but it was not relevant to Ralph's "knowledge that on this particular night [A.C.] did not consent to have sex." *See* 958 N.W.2d at 801. The court also ruled that there was clear proof that Ralph engaged in the prior acts, and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The court thus concluded that the evidence was

admissible but the jury could consider it "only for the purpose of determining Mr. Ralph's motive to commit the sexual assault count."[5]

The prosecutor then questioned Ralph about the prior incidents:

> STATE: Mr. Ralph, you had testified that you and [A.C.] have had fights before; is that correct? RALPH: Yes.
> Q: And those fights have been physical before, hadn't they? A: Yes.
> Q: And physical in that you were physically assaultive towards her in those fights; correct? A: Yes.
> Q: And in some cases, [A.C.] had bruising after those altercations; correct? A: Yes.
> Q: And bruising to her eyes in September? A: Yes.
> Q: And there was an incident in November where you were fighting at her house and you grabbed her and she had a bruise on her arm after that; is that correct? A: Yes.
> Q: So this isn't the first time. So when you say you couldn't believe that you hurt her in this incident that you shoved her on the stairs, why was it surprising if you've hurt her in the past? A: Well, when I had said that, I didn't mean, like, literally couldn't believe it. I meant like, just in that moment, you know, emotions were high. And I was maintaining myself, you know, the whole time.

Ralph argues that the court should have excluded this testimony because it was not relevant to any legitimate, disputed issue. According to Ralph, "there was no dispute that [he] and [A.C.] had sex," so the "only issue in dispute was whether it was by force or against [A.C.]'s will." He claims that the court abused its discretion in admitting the testimony to prove his motive to commit sexual abuse because "the fact that an assault occurred in September does not explain why Ralph would have had a reason to sexually assault [A.C.] three months later."[6]

---

[5] The court instructed the jurors they could not use the evidence "to prove Mr. Ralph's character"—they could only consider it "for the purpose of establishing motive to commit sex abuse against [A.C.]."

[6] Ralph claims that our supreme court's decision in *State v. Putman* "is controlling" on the motive issue. *See* 848 N.W.2d 1, 10 (Iowa 2014) (finding that Putman's "motive for sexually abusing [a child victim] was not a legitimate or disputed issue"). And he claims our holding that the court improperly admitted evidence of prior

Emphasizing an excerpt of the State's closing argument, Ralph contends: "The relevance suggested in the prosecutor's summation is that the jury should infer Ralph sexually assaulted [A.C.] because he has a propensity for violence. Of course, this is precisely why the evidence should have been inadmissible under Rule 5.404(b)." Lastly, Ralph states that "[w]hatever probative value the evidence had to the sex abuse allegation—if any—was substantially outweighed by the danger of unfair prejudice to the defendant." But he doesn't elaborate on that point.

To counter, the State first argues that the court should have permitted the prosecution to offer the prior bad acts during its case-in-chief to show Ralph's motive, intent, and lack of accident as to the assault causing bodily injury count because the "State had the burden of proof on every element of that charge."[7] The State further contends that the "evidence was also relevant for another non-propensity purpose: it helped explain why [A.C.] reacted in the way that *she* did, both during the night of [the incident] and in the days that followed." According to the State, that "evidence was immensely probative, bearing directly on the credibility of [A.C.]'s testimony—a central issue. And it (properly) undercut Ralph's arguments that jurors should not believe her testimony." Thus, the State urges:

---

domestic abuse in *State v. Little* "is equally true in this case." *See* No. 08-1125, 2010 WL 786011, at \*10–13 (Iowa Ct. App. Mar. 10, 2010) ("We have difficulty accepting the prosecution's theory that acts showing [the defendant's] power and control over his ex-wife . . . can be admitted to prove he seriously injured and kidnapped [his second wife] years later. This seems to us a classic example of impermissible 'propensity' evidence."). *Putman* and *Little* are distinguishable from Ralph's case. *See id.* at \*11 ("If the conduct had involved the *same victim* . . . this would of course be a different case.") (emphasis added)); *Rodriguez*, 636 N.W.2d at 242.

[7] Ralph counters that he "admitted he was guilty of committing the assault causing injury—so his specific intent was never in dispute at trial."

Ralph was never entitled to exclusion of this prior-bad-act evidence, and it all should have been admitted from the get-go. This means that this Court should affirm, regardless of what it thinks of the trial court's stated reason for letting the State use a morsel of that evidence when it cross-examined Ralph.

*See State v. Dessinger*, 958 N.W.2d 590, 599 (Iowa 2021) (we may affirm a ruling admitting evidence on any grounds established by the record, even if not argued or relied on below).[8]

Alternatively, the State argues that the evidence of prior physical abuse was admissible for the limited purposes of impeaching Ralph's testimony and proving that he had a motive to commit a sex act with A.C. against her will. The State emphasizes that the court specifically cited *Goodson* in its ruling admitting the evidence.[9] *See* 958 N.W.2d at 801. The State concedes that "[t]o a certain extent, Ralph is right when he asserts that '[t]he State's entire case depended on [A.C.]'s credibility.'" But according to the State:

That's why *Goodson* is so pertinent: it explained that proof of prior acts of domestic abuse in that same relationship is highly relevant to establish motive (including motive to commit sexual abuse)—which becomes critical when a jury needs to resolve conflict in direct testimony on whether the defendant had sex with the victim, against her will.

*See id.* at 801–02 ("[T]he evidence helps to set the stage for the antagonistic relationship between [the defendant] and [the victim] and eliminates the necessity of the jury to conduct a pure 'he said, she said' test of credibility.").

---

[8] Ralph urges that it "would be fundamentally unfair to affirm on a theory not presented below without allowing Ralph a proper limiting instruction and his counsel the opportunity to address it in her closing argument."

[9] The State points out that "Ralph's brief on appeal does not discuss, cite, or mention *Goodson*." Neither does Ralph's reply brief.

In sum, the State argues that if "Ralph had a motive to exert power and control over [A.C.], that fact made it more likely that Ralph had sex with [A.C.] against her will, as she described. And this evidence of Ralph's prior acts of physical abuse towards [A.C.] during this relationship helped establish that motive." *See id.* The State also insists that the "need for this evidence was heightened when Ralph's testimony suggested that his relationship with [A.C.], up to that point, had included no prior instances of physical abuse." *See Taylor*, 689 N.W.2d at 130 (stating that a defendant is "not entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship . . . [was] peaceful and friendly" (citation omitted)). So, according to the State, "the court did not err in admitting evidence of prior instances of physical abuse as relevant to establish Ralph's motive to commit sexual abuse."

We agree with the State that the evidence was admissible to prove Ralph's motive to commit a sex act with A.C. against her will. True, motive *itself* was not an element of the sexual abuse count. But the State did have to prove that Ralph "performed the sex act by force or against [A.C.'s] will."[10] The State summarized the case to the jury in its closing argument this way:

> The element for you to deliberate on, essentially, in this entire trial is Element Number 2. Did [Ralph] commit the sex act by force or against the will of [A.C.]? What does that mean? Did she consent? . . .
> And in this case, you have both of them, Mr. Ralph and [A.C.], telling you they were together that night and there was a sex act. They diverge on consent, and you have to decide what version of events is more credible, what version of events makes more sense based on all of the evidence that you have.

---

[10] Ralph recognizes that this element was a legitimate issue in dispute at trial.

As in *Goodson*, Ralph and A.C. "offered the jury highly conflicting versions" of their sexual encounter. *See* 958 N.W.2d at 801. And the jury had to choose a version when deciding whether the sex act was consensual. So, relying on *Goodson*, the district court properly admitted evidence of the prior instances of physical abuse in their relationship because it was relevant "to show what motivated" Ralph on the night of the charged offenses—his desire to exert power and control over A.C.[11] *See id.* It was also "relevant on the question of whose story to believe"—whether Ralph committed a sex act against her will, as A.C. testified, or whether they engaged in consensual sex, as he testified. *See id.* We reject Ralph's argument that offering the evidence was an impermissible effort to show that he had a propensity for violence. Instead, the evidence was "designed to show the nature of the relationship between [A.C.] and [Ralph] that had direct relevance to determining what happened" during their sexual encounter. *See id.*

Thus, the district court properly exercised it discretion in allowing the State to cross-examine Ralph about the prior incidents. And the relevance of the testimony was not substantially outweighed by its prejudicial effect. *See id.* at 802 ("In cases with conflicting direct testimony, it is crucial to have triangulating evidence to resolve the issue."). Ralph is not entitled to a new trial.

**AFFIRMED.**

---

[11] As here, the prior bad acts in *Goodson* involved physical assaults against the victim—none of the prior incidents were sexual in nature. *See* 958 N.W.2d at 797.